**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| CHRISTOPHER HARDY, | ) | CASE NO. 1:08CV0161 | |
| | ) | | |
| PETITIONER, | ) | JUDGE SARA LIOI | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| MAGGIE BEIGHTLER, | ) | **MEMORANDUM OPINION** | |
| | ) | | |
| | ) | | |
| RESPONDENT. | ) | | |
| | ) | | |

Before the Court[1] is the Report and Recommendation ("R&R") of Magistrate Judge Greg White recommending that the habeas petition be granted on the basis of ground one, double jeopardy. (Doc. No. 18.)[2] Respondent has filed objections to the R&R (Doc. No. 20, as supplemented by Doc. No. 21) and petitioner filed a brief in opposition to the objections (Doc. No. 22). Pursuant to Fed. R. Civ. P. 72(b)(3), the Court has conducted its *de novo* review of the matters raised in the objections. For the reasons set forth below, the R&R is rejected as to its ultimate conclusion. Further, the Court withdraws the reference to the Magistrate Judge and resolves the remaining grounds of the petition not addressed by the R&R. All of these grounds are overruled. Therefore, the petition for writ of habeas corpus is dismissed.

---

[1] This case was recently reassigned to the docket of the undersigned. At the time, the R&R was already at issue.

[2] The R&R is based upon arguments made by the parties in the Petition (Doc. No. 1), the Answer (styled as a "Return of Writ") (Doc. No. 6), and the Reply (styled as a "Traverse") (Doc. No. 7). In addition, the Magistrate Judge heard oral arguments on the issue of double jeopardy, in particular as it relates to whether the kidnapping charge on which petitioner was convicted at his second trial was sufficiently differentiated from the abduction charge of which he was acquitted at his first trial. Following the hearing, the parties filed briefs and these, too, have been considered. (Doc. Nos. 16, 17.)

# I. PROCEDURAL BACKGROUND

Petitioner was indicted in October 2002 pursuant to a seven-count indictment charging him with two identically-worded counts of rape, two identically-worded counts of kidnapping, and one count each of abduction, felonious assault, and domestic violence. (Return of Writ, Doc. No. 6 ["Return"], Ex. 3.) Following a jury trial in early 2003, he was convicted on one count of rape, one count of kidnapping, and domestic violence. He was acquitted on one count of rape, one count of kidnapping, and abduction, and the trial court granted petitioner's Rule 29 motion to dismiss the felonious assault count. On direct appeal, the Eighth District Court of Appeals of Ohio reversed and remanded for a new trial because the trial court had responded to jury questions outside petitioner's presence. (Return, Ex. 2.) It also denied several assignments of error as moot, but addressed on the merits several others "which, if proved, would require the entry of judgment in [petitioner's] favor." (*Id.* at ¶ 18.) These latter assignments of error included two which challenged the indictment as containing multiplicitous counts of rape and kidnapping, along with abduction, which were allegedly not differentiated in the court's jury instructions, implicating petitioner's right not to be tried twice for the same offense. The court of appeals overruled these assignments of error, concluding that the prosecutor, during the course of the trial, had differentiated the charges by linking them to specific portions of the facts as presented. *See* Return, Ex. 2.[3]

---

[3] The decision of the court of appeals was 2 to 1. The dissenting judge noted that no bill of particulars had been supplied to differentiate the two rape and the two kidnapping charges, that the State never moved to amend the indictment, that no jury instructions were given to differentiate the charges, and that, although the prosecutor *argued* that certain conduct referred to certain counts, the indictment was never amended to match that argument and the jury was never so instructed. Relying on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005) (holding that "carbon-copy" indictments violate due process), the dissent concluded that, since there was nothing to differentiate the counts one from another "there is no way for this court to conclude which rape and which kidnapping counts resulted in conviction and which in acquittal at the first trial." (Return, Ex. 1 at ¶ 110.)

Petitioner was retried before a jury on one count of rape and one count of kidnapping, the domestic violence charge having been dismissed on speedy trial grounds before the second trial. On April 14, 2005, the jury found him guilty of kidnapping. (Return, Ex. 5.) A mistrial was declared on the rape charge because the jury deadlocked; that charge was later dismissed at the State's request. (Return, Ex. 15.) On June 13, 2005, petitioner was sentenced to three years imprisonment followed by five years of mandatory post-release control. He was also ordered to pay court costs and a $3000 fine. (Return, Ex. 6.)

Petitioner, represented by counsel, took a direct appeal. On March 15, 2007, the Ohio court of appeals affirmed the conviction. (Return, Ex. 21.) Petitioner thereafter exhausted all his available state court proceedings, including an appeal to the Ohio Supreme Court, which was dismissed on September 26, 2007 as not involving any substantial constitutional question. (Return, Ex. 29.)

On January 18, 2008, petitioner filed the instant petition for writ of habeas corpus raising eight grounds for relief. (Petition, Doc. No. 1.) On May 27, 2009, the assigned magistrate judge issued the R&R, addressing only the first ground and recommending that the petition be granted, that the conviction be vacated, and that petitioner be released from state custody because "Hardy's sole conviction violated the prohibition against double jeopardy[.]" (R&R at 22.)

### III. STATEMENT OF THE FACTS

Under 28 U.S.C. §2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct[ ]" and a habeas corpus petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

In the Return, respondent adopted the factual findings of the Eighth District Court of Appeals of Ohio. In the Traverse, petitioner made no attempt to rebut the presumption of

correctness. Therefore, the following facts, as stated by the Ohio court are presumed to be correct and will control herein. That court stated:

[*P1] Defendant Christopher Hardy appeals from his conviction for kidnapping. For the reasons set forth below, we affirm.

[*P2] In October 2002, defendant was indicted pursuant to a seven-count indictment that charged him with rape, kidnapping, abduction, felonious assault, and domestic violence, all in connection with alleged attacks upon his estranged wife in April 2002. Defendant was eventually convicted of one count of rape, one count of kidnapping and domestic violence. This Court reversed and remanded for a new trial, however, because the trial court responded to jury questions outside of defendant's presence. See *State v. Hardy*, Cuyahoga App. No. 82620, 2004 Ohio 56. This Court found many of defendant's remaining assignments of error moot, but addressed those assignments of error which raised issues "which, if proved, would require entry of judgment in [defendant's] favor." This Court then considered defendant's contentions that the indictment contained multiplicitous counts of rape and kidnapping which were undifferentiated and which implicated "his right not to be tried twice for the same offense." In rejecting these assignments of error, this Court noted that the prosecutor had in fact differentiated the two rape charges, and that the "prosecutor also distinguished the two kidnaping charges, associating each of them with the separate incidents of rape."

[*P3] Upon retrial before a jury, the state's evidence demonstrated that defendant and Mrs. Hardy met while working at the Metzenbaum Center and were married in October 2001. By 2002, the marriage had become acrimonious. In March 2002, defendant and Mrs. Hardy argued and she decided to leave. Mrs. Hardy testified that her car was blocked in the driveway so she called her sister to pick her up. Defendant called the police who remained at the scene while Mrs. Hardy removed some of her belongings from the home.

[*P4] Mrs. Hardy moved from the residence, but defendant wanted to reconcile. Mrs. Hardy acknowledged that she spent a few nights at the home, but had no intention of moving back in or of reconciling. According to this witness, she continued contact with him in order to obtain the rest of her property, which included bedroom furniture and jewelry.

[*P5] On April 5, 2002, Mrs. Hardy and defendant spoke and she went to his home in South Euclid. Defendant left to pick up his daughter and granddaughter and Mrs. Hardy went to a tanning salon. She then took the girls to the grocery store and bought items for dinner, as well as wine and beer. After they ate dinner, Mrs. Hardy took a bath. The girls then watched television in another room while defendant and Mrs. Hardy watched television in defendant's bedroom.

4

[*P6] According to the witness, defendant pressured her for sex, and she "gave in" because he has a bad temper. Later, defendant began to argue with her over her friendship with a female coworker. Mrs. Hardy started to leave and defendant pulled her back on the bed and began to speak abusively to her. He then inserted three fingers into her vagina, and pulled her across the bed and ripped off her T shirt. For approximately one hour, he refused to let her leave the bed as he continued to degrade her and refused to let her have her clothing.

[*P7] After defendant calmed down, she went to the kitchen and got a glass of milk. Defendant then threw the milk at her and ordered her out. As Mrs. Hardy got into her car to go, defendant jumped on the hood of the car and pulled on the door handle, breaking both the rear view mirror and the driver's side window.

[*P8] After Mrs. Hardy left the home, defendant contacted South Euclid police to notify them that the woman had returned to his home to get clothes, and that she had been drinking and taking medication. He also stated that he had not touched her or harmed her in any way.

[*P9] The woman testified that she then drove to her home in Geauga County. She tried to call a friend [sic] then took a shower and went to bed. The next morning, she called a hotline for help, then went to the sheriff's department and to the hospital. Medical records demonstrated that the woman had injuries to her breast, arm, and thigh, and photographs depicted damage to her car.

[*P10] South Euclid police went to defendant's home to speak with him in connection with their investigation of the matter. According to Det. Ardonetto [sic], defendant raised his fists and was combative, so the officers handcuffed him and took him to the police station. After receiving Miranda warnings, defendant made an oral statement and also made a written statement. Later, after obtaining a bond and being released, he returned to the station and made a second written statement. In his statement, defendant indicated that Mrs. Hardy had initiated sexual relations and that he was unable to have intercourse due to an injury.

[*P11] Defendant elected to present evidence and testified that, during their marriage, Mrs. Hardy learned that he has significant assets, including certificates of deposit and stock. He further indicated that Mrs. Hardy was able to take all of her possessions from the home in the presence of police so she had no real concern about any remaining property.

[*P12] According to defendant, Mrs. Hardy wanted to reconcile and, on the night of April 5, 2002, although he had plans to be with his daughter and granddaughter, the woman arrived and behaved romantically. She took a bath then changed into a t-shirt, and asked him to lay with her on the bed. He had been injured so he could not have intercourse, despite the woman's attempts. She then

5

asked him to penetrate her digitally. Ultimately, according to defendant, the woman became angry, and left, saying, "I'll fix you. You rejected me."

[*P13] Defendant denied raping the woman or harming her and he denied damaging her car. He believed that the woman's allegations were part of a scheme to get at his assets. He stated that he contacted police after she left simply to notify them that the woman was drinking and driving.

[*P14] Defendant also presented the testimony of various co-workers and former co-workers who testified that he is truthful and nonviolent. Defendant's granddaughter also testified and stated that she did not hear any fighting or arguing.

[*P15] Following deliberations, the jury could not reach a verdict as to the rape charge and the trial court declared a mistrial as to this count. Defendant was convicted of kidnapping, however, and sentenced to three years of imprisonment. He now appeals and assigns twelve errors for our review.

(Return, Ex. 1.)

## IV.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 72(b)(3), "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." This *de novo* review, as well as the Court's own independent review of the grounds not addressed by the R&R, requires the Court to apply the provisions of 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA") and the cases construing the amendments.

Title 28, Section 2254(d) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained these provisions as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13.

## V. DISCUSSION OF R&R AND OBJECTIONS

In ground one, petitioner asserts that he was denied his fifth amendment right not to be twice placed in jeopardy for the same crime when he was retried on an identical kidnapping count for which he had been found not guilty at his first trial. He argues that, at his original trial, he was found not guilty of one count of rape, one count of kidnapping, and one count of abduction, but that it cannot be determined from the indictment and jury charge which act he was actually convicted of and which he was found not guilty of. He argues that his retrial conviction of kidnapping cannot constitutionally stand when he was acquitted at his first trial of an identical kidnapping count and the lesser offense of abduction. He also argues that his acquittal on a felonious assault charge at his first trial would bar retrial for kidnapping. (Traverse at 2-3.)

Although ground one raises several theories to support a claim of double jeopardy, the R&R concentrates on petitioner's assertion that there was overlap between the kidnapping charge of which he was convicted at his second trial and the abduction charge of which he was acquitted at his first trial. The R&R first determines that, although presented with

7

the issue of collateral estoppel and issue preclusion as it related to the alleged overlap of these two charges, the state appellate court failed to address it and, therefore, this Court must conduct a *de novo* review. After a lengthy discussion comparing the first and second trials, the R&R concludes that the jury in the second trial was improperly presented with evidence of acquitted conduct and that, "[b]ased upon the jury's failure to convict [petitioner] on the rape charge, it is highly unlikely the same jury would have convicted him of kidnapping if limited only to the evidence of restraint associated directly with the rape allegation while not considering the conduct previously associated with the abduction charge at the first trial." (R&R at 21.) The R&R, therefore, concludes that the writ should be granted on ground one and that the remaining grounds for relief are rendered moot and need not be addressed.

Respondent filed objections to the R&R, arguing:

1.   Double jeopardy in the form of collateral estoppel or issue preclusion as related to the abduction charge has never been presented to the state courts.

2.   The second trial was based only on the offense of digital rape/penetration and its accompanying kidnapping charge.

3.   The state Court of Appeals' determination that the retrial was based only on the offenses of which Hardy was convicted at the first trial was not unreasonable in light of the evidence presented.

4.   At the second trial, the parties were careful to explain what Hardy was being tried for, to wit: digital rape/penetration.

5.   The magistrate judge appears to take issue generally with the proposition that the evidence in the second trial was virtually the same as in the first trial.

6.   The elements of abduction and kidnapping are not the same.

7.   At the second trial, the kidnapping offense had different elements as compared to the rape offense of which Hardy was found *not* guilty.

8

The Court construes some of the seven objections above as related to one another and will, therefore, address them as follows: first and third objections (whether collateral estoppel/issue preclusion was raised on direct appeal and what standard of review must be applied); fifth objection (similarity of evidence at the two trials); second and fourth objections (whether the charges at the second trial were sufficiently and appropriately delineated from those at the first trial); and, finally, sixth and seventh objections (whether the elements of the various crimes are different).

**A.     Collateral Estoppel/Issue Preclusion and the Standard of Review**

Respondent first argues (Objection No. 1) that the matters upon which the R&R bases its conclusion "have never been addressed by the state courts because these matters were never fairly presented to them." (Objections at 3.)[4] This is simply not so.

In the appellant's brief filed on direct appeal from the second trial, petitioner argued as follows:

> The court, in defining kidnapping, did not limit it to the specific version of kidnapping which this court said differentiated the guilty and not guilty verdicts at th [sic] first trial. The jury was given a general generic definition. (Tr. 1010-12). **Since the court allowed evidence concerning those claims of kidnapping about abduction of which defendant had been acquitted at his first trial, (Tr.389-402), there is no way of knowing which acts of defendant formed the guilty verdict of kidnapping.** This would deny defendant's Fifth Amendment right not be placed twice in jeopardy. This is because an indictment must be specific enough "in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction". *Russell v. United States*, 369 U.S. 749, 763-64 (1962).

---

[4] In the Return, respondent states that every ground raised has been exhausted. Nonetheless, the Court reads respondent's current objection as an assertion that the magistrate judge has inserted a new issue into these proceedings.

(Return, Ex. 18 at 13, emphasis added.) Petitioner then pointed to *Ashe v. Swenson*, 397 U.S. 436 (1970) for the proposition that "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in a future lawsuit." (*Id.*, quoting *Ashe*, 397 U.S. at 443.) As a result, he argued, his kidnapping conviction from the second trial could not stand. He further asserted that he had been charged at his original trial with one count of felonious assault on which he was acquitted and, as a result, it was improper to include "inflicting serious physical harm" as an element of kidnapping." (*Id.* at 15.)

The state court of appeals ruled that it had already addressed these issues in the first direct appeal and that those first conclusions were now "law of the case." It stated:

[*P21] In *Hardy I*, defendant asserted:

[*P22] "[T]he indictment was multiplicitous because it contained two counts of rape, two counts of kidnaping and a count of abduction, all of which allegedly occurred on the same date, and the court's jury instructions did not differentiate them. Appellant then argues that the verdicts were inconsistent, somehow **implicating his right not to be tried twice for the same offense.**" (Emphasis added).

[*P23] In rejecting these claims, the court stated:

[*P24] "At trial, the prosecutor differentiated the two rape charges, arguing that count one referred to the incident of vaginal intercourse, and count two referred to the incident of digital penetration. The prosecutor also distinguished the two kidnaping charges, associating each of them with the separate incidents of rape. **Finally, the prosecutor argued that defendant abducted the victim when he prevented her from leaving the bedroom, pulled off her shirt, and verbally assaulted her.** Thus, the charges were not multiplicitous. Given this differentiation of the charges, the jury's verdict finding that the defendant was guilty as to counts two and four, the second rape and kidnaping charges, but not guilty as to counts one, three, and five, were consistent. Therefore, we overrule the fourth and fifth assignments of error." *Id.*

[*P25] Because the *Hardy I* court considered defendant's claim that the indictment was defective since it contained identical counts, and that this implicated "his right not to be tried for the same offense," and these claims are

10

substantially the same as the issues raised herein, they clearly constitute the law of
the case. As such they are binding herein.

(Return, Ex. 1, first emphasis added by appellate court; second emphasis added by this Court.)

Clearly, the issue of the potential overlap between the facts supporting the
kidnapping charge and the facts supporting the abduction charge was raised by petitioner on his
second direct appeal.[5]

As noted by the R&R, however, the court of appeals "did little more than mention
the kidnapping conviction and never addressed the issue of whether it was secured by reliance
upon acquitted conduct from the first trial." (R&R at 10, citing Return, Ex. 1 at ¶¶ 26-35.) The
R&R then concludes: "Because the merits of Hardy's double jeopardy/collateral estoppel claim
went unaddressed, this Court conducts a *de novo* review." (*Id.*)

As suggested by Objection No. 3, AEDPA ordinarily requires a habeas court to
afford substantial deference to state court adjudications on the merits. 28 U.S.C. § 2254(d) ("[a]n
application for writ of habeas corpus [...] shall not be granted [...] unless the adjudication of the
claim-- [...] (2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding"). However, since the issue
of collateral estoppel was fully presented to the state appellate court, but not fully addressed by

_____

[5] Respondent also argues that the issue was not raised in petitioner's jurisdictional memorandum before the Ohio
Supreme Court. This Court, however, concludes that this issue was indeed raised. In Proposition of Law No. 1,
petitioner inartfully argued that he was denied his right not to be twice placed in jeopardy "when he has been retried
on identical counts of an indictment of which he has been found not guilty of three indistinguishable counts." In his
argument supporting this proposition of law, he points specifically, though without much detail, to the identical rape
and kidnapping charges *and* the abduction charge. He concludes by arguing:

> The court, at defendant's first trial, in instructing the jury on counts three and four, repeated the
> allegations of the indictment. It did not identify any different conduct with respect to each count of
> kidnapping. (Tr.597). The court, instructing on count five, again repeated the allegations of the
> indictment. (Tr.601). The jury returned a verdicts [sic] of not guilty of kidnapping on count three
> and guilty of kidnapping on count four. In addition, defendant was found not guilty of abduction
> as charged in count five. (Tr.636-37).

(Return, Ex. 28 at 5.)

that court, it is proper for this Court to apply a *de novo* standard of review, not the deferential "unreasonable in light of the evidence standard" articulated in Section 2254(d). *See Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2004) ("when a claim has not been adjudicated on the merits in State court proceedings, and has not been procedurally defaulted, we look at the claim *de novo* rather than through the deferential lens of AEDPA") (internal quotation marks omitted) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("[w]here, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply")).

The Court overrules these two objections. The issue of collateral estoppel/issue preclusion was presented to the state courts but, because those courts did not fully address the issue on the merits, this Court applies a *de novo* standard of review, not the deferential AEDPA standard.

**B.      Similarity of Evidence at the Two Trials**

Respondent's Objection No. 5 relates to what is characterized as the R&R's "tak[ing] issue generally with the proposition that the evidence in the second trial was virtually the same as in the first trial." (Objections at 13.)

The Court overrules this objection finding that the R&R did not take issue with identical or similar evidence in general, but rather with allowing the jury to consider, without limiting instruction, facts related to charges on which petitioner had been acquitted.

**C.      Sufficient Delineation of Charges Between the Two Trials**

Related to the issue of double jeopardy, in Objection No. 2, respondent argues that the second trial was based only on the offense of digital rape/penetration and its

accompanying kidnapping charge and, in Objection No. 4 that, at the second trial, the parties were careful to explain what Hardy was being tried for, to wit: digital rape/penetration.

Respondent, at pages 8-9, carefully sets forth record citations showing that it was clear at the first trial that the rape charge in Count One related to the alleged vaginal intercourse with the victim and the rape charge in Count Two related to the alleged digital penetration of the victim *and* that the two events were clearly separated in time. It was also clear that the two kidnapping charges in Counts Three and Four "mirrored" the two rape charges, with the element of restraint for kidnapping in Count Three being the vaginal intercourse and the element of restraint in Count Four being the digital penetration. At closing argument during the first trial, the prosecuting attorney argued as follows:

> Each count in the indictment constitutes a separate and distinct crime. And as such, they are deserving of your independent and individual deliberation.

> And so with that in mind, I find it incumbent upon myself to, at this moment, to go through the indictment and indicate to you the State's theory of each count and then indicate to you the evidence that supports each count in order for you to return the appropriate verdict.

> Count number one, the theory is that while the victim was inside of the apartment of the defendant and seated at the edge of his bed, he approached her, pushed her back and engaged in vaginal intercourse with her against her will. Her testimony was that she told him she didn't want to, she said no and that essentially she submitted because she knew what would happen if she resisted.

> And in count number two, the elements are the same but the theory is that the defendant raped the victim when he inserted three fingers into her vagina and did so without her consent, against her will and by force or threat of force.

> And so those are the two separate and distinct acts that we are alleging constitute the crime of rape.
> * * *
> In terms of counts three and four, they mirror count one and two to a certain extent. Count number three and count number four the charge is the same and it's kidnapping. And the allegation is that by force, the defendant – there's a

13

lot of legal language. You'll get the jury instructions that the Court will read to you at the end.

But pertinent to this case and our theory, the allegation is that the defendant, by force, restrained her of her liberty for the purpose of terrorizing her or engaging in sexual activity.

\*\*\*

In Ohio, if you restrain someone of their liberty for the purpose of engaging in sexual activity, it is a crime. And that's what our theory is in count numbers three and four.

He restrained her when he had sexual intercourse with her, vaginal intercourse, and he restrained her of her liberty when he inserted his three fingers into her vagina.

(Doc. No. 9-1, First Trial Tr. at 543-44, 546-47, 547-48.) Respondent, therefore, argues that, because the rape and kidnapping charges were clearly differentiated during the first trial, there was no doubt at the second trial that petitioner was being retried only for the second alleged rape (the digital penetration - Count Two) and its related kidnapping (Count Four).[6]

As to Objection No. 4, respondent asserts, with references to the trial court record, that "both the prosecution and the defense were very careful to explain to the jury that the only offenses that Hardy was on trial for in the second trial were the rape and accompanying kidnapping related to the insertion of Hardy's fingers into the victim's vagina and not the preceding intercourse." (Objections at 12.) The trial court's instructions to the jury at the second trial, given with the concurrence of both parties, defined sexual conduct for purposes of the rape charge as "the insertion, however slight, of any part of the body or any instrument or apparatus, or other object into the vaginal cavity of another." (Doc. No. 6-15, Second Trial Tr. at 1007-08.)

---

[6] It is not entirely clear to the Court why respondent makes this objection because the R&R expressly states that it "need not reach the question of whether the prosecution's argument alone [at the first trial] was constitutionally sufficient to differentiate the charges at the first trial." (R&R at 10.) The R&R really focuses on the use of conduct related to the first trial's acquitted abduction charge to convict at the second trial on the charge of kidnapping. That issue is discussed in more detail herein.

In addition, the instruction with respect to the kidnapping charge at the second trial made no mention of "serious physical harm," since petitioner had been acquitted of abduction at the first trial and the felonious assault charge had been dismissed and, therefore, no element of serious physical harm could be considered for any purpose, even kidnapping. (*Id*. at 1010.)[7]

   The state court of appeals, on petitioner's first direct appeal, properly concluded that Hardy had waived any right to argue that the indictment was defective because he had never raised that issue before the trial court. (*See* Return, Ex. 2 at ¶ 21.) The court of appeals also concluded that "the prosecutor differentiated the two rape charges [...] [and] the two kidnaping charges [...]." (*Id*. at ¶ 22.) As a result it overruled petitioner's assignments of error which argued that the counts of the indictment were multiplicitous. When the same argument was raised on the second appeal, after petitioner was found guilty of the kidnapping charge that related to the digital penetration rape charge, the court of appeals concluded, not only that the first appellate decision was the "law of the case," but that its holding on the first appeal, coupled with its remand for retrial, "undoubtedly provided [Hardy] with notice of the charges he would face on retrial." (Return, Ex. 1 at ¶ 35.) It further concluded: "[A]t the retrial, the prosecuting attorney clearly indicated that he was proceeding only on the rape and kidnapping charges for which defendant had been previously convicted, (Tr. 72), and these were the offenses related to the

---

[7] The kidnapping jury instructions at the first and second trials were as follows, respectively:

  [FIRST TRIAL]: Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 5th day of April, 2002, and in Cuyahoga County, Ohio, the defendant, by force, threat or deception, removed Susan Hardy from the place where she was found or restrained her of her liberty for the purpose of terrorizing **or inflicting serious physical harm on** Susan Hardy and/or engaging in sexual activity with Susan Hardy against her will.

  [SECOND TRIAL]: Before you can find the Defendant guilty of kidnapping, you must find beyond a reasonable doubt that on or about the 5th day of April, 2002, and in Cuyahoga County, Ohio, the Defendant, by force, threat, or deception removed Susan Hardy from the place where she was found or restrained her of her liberty for the purpose of terrorizing and/or engaging in sexual activity with Susan Hardy against her will.

(Doc. No. 9-1, First Trial Tr. at 597-98 (emphasis added); Doc. No. 6-15, Second Trial Tr. at 1010.)

digital penetration[.]" (*Id.* at  ¶ 36.) The court of appeals also pointed to distinctions that the prosecutor made during voir dire, his opening statement and his closing argument.

In light of the above, to the extent this issue can even be found in the R&R, the Court sustains these two objections.

**D.      Differing Elements for the Varying Crimes**

Respondent's Objection No. 6 is that, although the R&R finds "overlapping evidence" with respect to the acquitted abduction claim in the first trial and the kidnapping charge of which petitioner was found guilty in the second trial, this cannot constitute error because the elements of abduction and kidnapping are actually not the same.[8]

The respondent asserts that an abduction charge includes the element of restraint *under circumstances creating a risk of physical harm to the victim*. Although a kidnapping charge *can* also include (and did in the first trial) an element of *inflicting serious physical harm on the victim*, in the second trial, because both the abduction and the felonious assault charges had resulted in acquittal/dismissal,[9] the prosecution abandoned any element of serious physical harm as it related to the kidnapping, asserting only that the restraint associated with the kidnapping was *for the purpose of terrorizing the victim or to engage in sexual activity*.[10] While the petitioner was acquitted of the rape charge at the second trial, he was convicted of kidnapping.

---

[8] In Objection No. 7, respondent also differentiates between the elements of the second trial's kidnapping charge (of which Hardy was found guilty) and its rape charge (of which he was found not guilty), apparently as a means of buttressing the argument that, even though petitioner was not convicted of the rape, he could be properly convicted of the kidnapping related to that rape.

[9] At the close of the State's case, the trial judge granted petitioner's Rule 29 motion to dismiss the felonious assault charge because "there's been no testimony to indicate that serious physical harm has been caused whatsoever to Susan Hardy." (Doc. No. 9-1, First Trial Tr. at 489-90.)

[10] *See*, n. 7, *supra*, for the exact language of the jury instructions at each trial relating to kidnapping.

16

This objection goes to the heart of the R&R's reason for proposing that the petition be granted on double jeopardy grounds.

The double jeopardy clause of the fifth amendment "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). An ingredient of the double jeopardy prohibition is the principle of "collateral estoppel," which "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Although developed in civil litigation, it "has [long] been an established rule of federal criminal law[.]" *Id.* "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* at 444 (internal quotation marks and footnote omitted). "The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Id.* (internal quotation marks and citation omitted).

Applying this principle of collateral estoppel, the R&R concludes: "[T]he State improperly used evidence of acquitted conduct from the first trial to secure Hardy's kidnapping

17

conviction at the second trial -- evidence that was barred by the double jeopardy clause." (R&R at 10.)

At the first trial, the prosecution argued as follows with respect to the abduction charge:

> Count number five is a charge of abduction. And here we get into a little bit of a different theory and different forms of evidence.
>
> Abduction alleges that the defendant, without privilege to do so, knowingly, by force or threat, restrained Susan Hardy of her liberty under circumstances which created a risk of physical harm or placed her in fear.
>
> Recall her testimony, ladies and gentlemen, after the defendant had assaulted her through vaginal intercourse and the digital penetration of her vagina, she wanted to leave and she testified how she tried to get out of the bedroom and then out of the apartment. And he kept grabbing her, pulling at her, pulled her shirt off, pushing her back into the bedroom and then continued the verbal assault, if you will, on her, degrading her, demeaning her, pointing out different portions of her anatomy.

(Doc. No. 9-1, First Trial Tr. at 548-49.) Respondent points out that, "the prosecution at the first trial argued that Hardy's conduct in not allowing the victim to leave, grabbing her, pulling at her, pulling her shirt off, and pushing her back into the bedroom constituted the offense of abduction." (Objections at 9, citing First Trial Tr. at 548-49.)

The R&R examined the prosecution's opening statement at the second trial[11] with respect to the conduct the prosecution identified as relevant to the kidnapping charge:

> It's at this point in time, ladies and gentlemen, that the Defendant commits the crimes that we're here asking you to consider. While in the bedroom in this argument, the Defendant begins to push and shove her and verbally and physically assault her.
>
> At some point during this altercation while she's sitting on the bed, he pushes her back on her back on the bed and then inserts the three fingers of his right hand into her vagina and begins to pull her around or pull her forward on the

---

[11] The R&R incorrectly identifies the opening statement as the closing argument.

bed as she's trying to escape. He's using his fingers in that manner (indicating) to try to pull her towards him. And all the time he is talking to her about how she is going to obey him or she's going to do what he wants her to do.

After she's able to get away from him, at that point he begins to verbally and physically abuse her further. She wants to leave the room and he starts pushing her against the wall. He starts grabbing her by her arms, both arms, with his fingers in the manner where his thumb is on her inner muscle, the bicep, and he begins pushing against her into the wall.

At some point in time I think she has admitted she is permitted to go to the kitchen and obtain a glass of milk. She goes back into the bedroom with the idea she's going to get dressed and leave. He begins his verbal assault on her again. [...] Nobody is going to want to be with you if you leave me.

As she begins to leave, at that point in time, the Defendant grabs her breast and begins pulling on it and squeezing it to the point where when she went to the hospital that bruise is noted in the medical records. You'll have the nurse coming in here to testify as to all of the bruises on Susan Dent's body when she reported to the hospital the next day.

After another short brief period of time, Ms. Dent is able to put on her clothing and attempt to leave the residence, but it doesn't end there. As she gets to her car, the Defendant follows her out into the driveway. And as she gets in the car, her window, it being April, was down somewhat, and as she tries to raise the window or close her door, he forces the window or, pardon me, forces his arm and hand into the window in an attempt to block her from getting out, take the keys, grab the steering wheel, something.

During the course of that series of events, her driver's side rearview mirror is cracked, not to the point where it falls off, but it's cracked and shattered. Yes, ladies and gentlemen, we have photographs showing the window as it was partially opened by the Defendant and the rearview mirror cracked because she went to the police the next day.

Also, the testimony from Ms. Dent will be that in order to prevent her from leaving, he actually jumped up onto the hood of the car and was trying to stop her in that fashion, but as she began to move, he kind of slid down off of the car and she was able to then just go.

(Doc. No. 6-10, Second Trial Tr. at 285-88.)

19

The R&R concludes that *facts* which supported the abduction charge of which petitioner was acquitted at the first trial were used at the second trial to convict him of the kidnapping charge. (R&R at 18.) And further:

> During the first trial, it was the prosecution's theory that the second kidnapping count – the only conviction obtained at the second trial – related to the events during the second alleged rape which involved the digital penetration. (First Trial Tr. 544-46.) Comparing the prosecution's theory at the first trial to its theory at the second trial, it is clear that the latter included events and/or actions allegedly occurring after the second alleged rape and corresponding kidnapping had ended. Thus, there is an impermissible overlap where the prosecution argued acquitted conduct underlying the abduction charge to secure Hardy's ultimate kidnapping conviction.
>
> Although Hardy was not being retried on the abduction charge, the State clearly asked the jury to consider the facts associated with that charge at the first trial to bolster the likelihood of a kidnapping conviction at the second trial. Perhaps the State might have established all the elements of kidnapping without considering the acquitted conduct, but it did not attempt to do so. Instead, from the onset of the second trial, the prosecution invited the jury to consider evidence of acquitted conduct that was barred by the doctrine of collateral estoppel. During closing arguments, the prosecution asked the jury to consider the "overall set of circumstances." (Tr. 963.) Consequently, Hardy has satisfied his burden of showing that the jury, when acquitting him of abduction at the first trial, necessarily found there was a reasonable doubt as to whether he restrained his wife of her liberty, by force or threat, during the events occurring after the second alleged rape. As such, relitigation of the issue was foreclosed at his retrial.

(R&R at 18-19.)

The instant objection relies not on the notion of overlapping *evidence*, but solely on the assertion that abduction and kidnapping (and, for that matter, rape) require proof of different *elements*. The Court finds merit in respondent's objection. In this case, petitioner was charged at his retrial under two separate Ohio statutes -- rape (O.R.C. § 2907.02) and kidnapping (O.R.C. § 2905.01). In addition, although the jury at the first trial was instructed that kidnapping could consist of restraining one of his/her liberty for the purpose of inflicting serious physical harm, that element was removed from the instruction at the second trial (*see*, note 7, *supra*),

20

undoubtedly because petitioner had already been acquitted of abduction, which requires proof of either creating a risk of physical harm to the victim or placing the victim in fear.[12] The jury was instead instructed that an element of kidnapping would be restraining one of his/her liberty for the purpose of terrorizing and/or engaging in sexual activity.

"'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'" *Gavieres v. United States*, 220 U.S. 338, 342 (1911) (quoting *Morey v. Commonwealth*, 108 Mass. 433 (1871)). Under what is known as the "*Blockburger* test," the Court "asks whether each offense contains an element not contained in the other. A defendant will be considered placed in double jeopardy only if 'every violation of one statute entails a violation of another.'" *United States v. Forman*, 180 F.3d 766, 768 (6th Cir. 1999) (quoting *United States v. Benton,* 852 F.2d 1456, 1465 (6th Cir.1988)). *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

"As *Blockburger* and other decisions applying its principle reveal, *see, e.g.*, *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *American Tobacco Co. v. United States*, 328 U.S. 781, 788-789, 66 S.Ct. 1125, 1128-1129, 90 L.Ed. 1575 (1946), the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States*, 420 U.S. 770, 785, n.17 (1975).

---

[12] At the first trial, the judge instructed the jury that "to place one in fear means to cause one to believe that she is in imminent danger of bodily harm." (Doc. No. 9-1, First Trial Tr. at 603.) Therefore, the person has to be placed in fear of something very specific, namely, bodily harm.

The R&R incorrectly focuses, not on the statutory elements of the kidnapping charge as it was tried at the second trial and as compared to the statutory elements of abduction, but on what it finds to be, as described by *Iannelli*, a "substantial overlap in the proof offered to establish the crimes." In *Grady v. Corbin*, 495 U.S. 508 (1990), the Supreme Court held that in successive prosecution cases, a double jeopardy violation occurs where the "same conduct" alleged in the first prosecution would have to be proven in the second prosecution. However, the *Grady* test of "same conduct" was rejected in *United States v. Dixon*, 509 U.S. 688 (1993) (collateral estoppel bars relitigation of previously rejected factual allegation only where same fact is ultimate issue in subsequent litigation). *See also Dowling v. United States*, 493 U.S. 342 (1990) (same); *United States v. Walker*, No. 96-2419, 2000 WL 353518, at *7 (6th Cir. 2000).

In the instant case, although there was overlap in the proof presented at the first trial in support of both abduction and kidnapping charges as compared to the proof presented at the second trial in support of only a kidnapping charge, there was no double jeopardy problem because kidnapping differs from abduction in one very significant way. "Kidnapping involves a *purposeful* removal or restraint, R.C. 2905.01, while abduction involves a *knowing* removal or restraint, R.C. 2905.02." *State v. Maurer*, 15 Ohio St.3d 239, 270 (1984) (footnotes omitted). Unlike with abduction, "[t]he inclusion of the five purposes in R.C. 2905.01 requires the state to show that the accused had a specific purpose in restraining the victim's liberty." *State v. Avery*, 126 Ohio App. 3d 36, 48 (Ohio App. Dist 3 1998). In this case, with respect to purpose, the jury was instructed that petitioner could be found guilty of kidnapping if he restrained the victim for the purpose of terrorizing her or for the purpose of engaging in sexual activity. This purposeful restraint is not an element of the crime of abduction.

For the reasons discussed above, this objection is sustained.

22

For all of the reasons discussed above, the R&R is rejected as to its ultimate conclusion and ground one is overruled.

## IV. DISCUSSION OF REMAINING GROUNDS

**A.     Ground Two**

In ground two, petitioner asserts that he was denied due process of law under the fourth and fourteenth amendments when he was arrested in his home without a warrant, evidence was taken from his home, and, incident to the arrest, he gave oral and written statements to the police.

As already noted above, the Ohio court of appeals made the following factual findings:

> [*P10] South Euclid police went to defendant's home to speak with him in connection with their investigation of the matter. According to Det. Ardonetto [sic], defendant raised his fists and was combative, so the officers handcuffed him and took him to the police station. After receiving Miranda warnings, defendant made an oral statement and also made a written statement. Later, after obtaining a bond and being released, he returned to the station and made a second written statement. In his statement, defendant indicated that Mrs. Hardy had initiated sexual relations and that he was unable to have intercourse due to an injury.

(Return, Ex. 1.)

Petitioner does not challenge these factual findings; he only argues that the police could have brought the information they had obtained from the victim to a magistrate to obtain a warrant and their failure to do so was unconstitutional. He also argues that the trial court's denial of his motion to suppress the statements he made was erroneous because there was no credible evidence to support a warrantless arrest in his home.

> [...] "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony ...." *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The Court "has never invalidated an arrest supported by probable cause solely

23

because the officers failed to secure a warrant." *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). To determine whether probable cause existed, we ask whether at the time of the arrest an officer knows of facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

*McCray v. Metrish*, 232 Fed. Appx. 469, 480 (6th Cir. 2007). "The necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest." *United States v. Watson*, 423 U.S. 411, 417 (1976).

The Ohio court of appeals rejected petitioner's argument that the trial court had improperly denied his motion to suppress, reasoning as follows:

[*P49] In *Adams v. Williams* (1972), 407 U.S. 143, 148,92 S.Ct. 1921, 1924,32 L.Ed.2d 612, 618, the court explained the concept of probable cause:

[*P50] [HN3] "Probable cause to arrest depends 'upon whether, at the moment the arrest was made ... the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 [145] (1964)."

[*P51] In this matter, Mrs. Hardy informed the Geauga County Sheriff's Department that defendant had raped and terrorized her and the sheriff's department informed the South Euclid police of the allegations. Det. Ardonetto [sic] testified that he proceeded under this statute [O.R.C. § 2935.04] to go to defendant's home and arrest him in connection with the investigation of this matter. Defendant then became combative and was arrested. In accordance with all of the foregoing, the trial court did not err in determining that the police officer were [sic] within their authority to make a warrantless arrest or [sic] defendant as there was reasonable ground to believe that he committed a felony.

[*P52] Moreover, defendant was given his Miranda rights and executed waivers of those rights then gave oral and written statements.

(Return, Ex. 1.)[13]

---

[13] O.R.C. § 2935.04 (When any person may arrest) provides:

The trial record shows that Detective Adornetto initially went to petitioner's home to take him to the police station for investigation of the claim that he had sexually assaulted his estranged wife. He testified as follows:

Q.      Detective, after interviewing Ms. Dent and obtaining the rape kit and the rolls of film, what was the next step in your investigation?

A.      Repeat that, please.

Q.      Sure. After you left Geauga County, what did you next do to further the investigation?

A.      I then returned to my department and attempted to do some research on both Christopher Hardy and Susan Dent-Hardy.

* * *

Q.      After you did that portion of your investigation, what did you next decide to do?

* * *

A.      I felt I had enough probable cause to pick him up for investigation of the charge.

Q.      What did you do to further that step?

A.      I borrowed Sergeant Adam Kaminsky and Joseph Hoegler from the uniformed shift.

Q.      You used a term of art, pick up for investigation, what do you mean by that in layman's terms?

A.      If a crime is committed and there's enough probable cause to believe that someone committed that act. And the seriousness of it, we're permitted to go pick that individual up for investigation, return him to our station--not just our station, any department, and to hold them for investigation for 48 hours until we can obtain a warrant.

---

When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained.

> Q.     How does that -- having someone picked up for investigation, how does that differ from an arrest [. . .] based on your training and experience?
>
> A.     Once you put somebody in handcuffs, they're under arrest because you're detaining them from their freedom.

(Doc. No. 6-12, Second Trial Tr. at 581-83.)[14] Once the police arrived at petitioner's home, the

situation changed. Detective Adornetto continued:

> Q.     So as you arrive at the address at [petitioner's home], what takes place?
>
> A.     Okay. I had learned that Mr. Hardy's apartment was located at the back of the house, it's like a two-or three-family home. It was a long driveway. Go in the back door, I knock on the back door, Mr. Hardy answered the door. I identified myself, told him why I was there, and I would like to have him come back with me for the investigation of a rape against Susan Dent-Hardy.
>
> Q.     Upon hearing that information, what did you see Mr. Hardy do or how did he react?
>
> A.     We were inside the hallway/kitchen area, immediately stepped back, raised both his hands up in a fist, and that's when Sergeant Kaminsky and Patrolman Hoegler, you know, grabbed his arms and handcuffed him.
>
> Q.     At that point in time, Detective Adornetto, was there any question as to whether or not the Defendant was under arrest?
>
> A.     No.

(*Id.*, Second Trial Tr. at 584.) In light of this testimony and the case law cited above, the Court

concludes that the state court's adjudication of this issue was not contrary to federal law.[15]

---

[14] Although it is true that Officer Hoegler testified that he and the other officers went to "arrest [petitioner] regarding an invest [sic] on a rape case[,]" and that they "were there to arrest and bring him back to the station for invest [sic] [,]"  (Doc. No. 6-10, Second Trial Tr. at 314), this testimony is not contrary to Detective Adornetto's testimony. To the extent that it might be considered contrary, there is no reason why a factfinder could not have credited Adornetto's testimony with more credibility since he was the officer in charge of the operation and likely had a better sense of his purpose in going to petitioner's home.

[15] There is another reason to reject petitioner's assertion that the officers should have obtained a warrant before arresting him. In *United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994), the court noted:

> It is well-settled that "[a]bsent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search." *United States v. Morgan*, 743 F.2d 1158,

Accordingly, ground two is overruled.

## B.    Ground Three

In ground three, petitioner asserts that he was denied due process of law under the fourteenth amendment (1) when the prosecutor offered inconsistent positions when presenting the same evidence at the retrial, and (2) when the trial court allowed his estranged wife to testify with reference to the offense of kidnapping even though she was an incompetent witness because of the spousal privilege. The first subclaim in this ground is very closely related to ground one and has been adequately addressed therein. The second subclaim warrants separate discussion.

Petitioner bases his assertion that his estranged wife was incompetent to testify against him on O.R.C. § 2945.42, which provides, in relevant part, that spouses may testify "in behalf of each other in all criminal prosecutions and [. . .] against each other in all actions, prosecutions, and proceedings for personal injury of either by the other, bigamy, or failure to

---

1161 (6th Cir. 1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985) (citing *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980)). The Supreme Court has recognized four situations satisfying the exigent circumstances exception: [1] hot pursuit of a fleeing felon, *United States v. Santana*, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-10, 49 L.Ed.2d 300 (1976); (2) imminent destruction of evidence, *Schmerber v. California*, 384 U.S. 757, 770-71, 86 S.Ct. 1826, 1835-36, 16 L.Ed.2d 908 (1966); (3) need to prevent a suspect's escape; and (4) risk of danger to police or others, *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

*Id.* at 679-80. As is clear from the detective's testimony, once petitioner raised his fists, the situation escalated from one where the officers intended to take him in for investigation and questioning to one where he was arrested under the fourth exception listed above. None of the cases cited by petitioner in his traverse offer any basis for a different conclusion. In *Kaupp v. Texas*, 538 U.S. 626 (2003), defendant was implicated in a murder by another man who confessed to the murder. Officers tried, but failed, to get a warrant to take defendant into custody for questioning. They nonetheless went to the defendant's home in the middle of the night and arrested him, after his father granted them entrance. In *Kirk v. Louisiana*, 536 U.S. 635 (2002), officers entered defendant's home based on an anonymous citizen complaint. Without a warrant, they arrested him and searched him. The Court reversed the court of appeal's finding that no exigent circumstances were required and remanded for further proceedings. In *Dunaway v. New York*, 442 U.S. 200 (1979), defendant was taken into custody after being implicated in a crime by a jail inmate who had been questioned by police. The police did not have enough information to obtain a warrant and conceded that they had no probable cause, but they took the defendant into custody anyway. During the custodial questioning, he incriminated himself and then was arrested on the basis of his incriminating statement. None of these cases stand for the proposition that officers cannot conduct a warrantless arrest of a person in his own home after he raises his fists and threatens them when they go to his home to investigate an alleged sexual assault.

27

provide for, neglect of, or cruelty to their children under eighteen years of age or their physically or mentally handicapped child under twenty-one years of age." As recognized by the Ohio court of appeals, state appellate courts have held that a husband charged with kidnapping his wife cannot use the privilege to preclude his wife from testifying against him even though "kidnapping" is not specifically listed as an exception in the statute. *State v. Bryant*, 56 Ohio App.3d 20 (Ohio App. 6 1988). Furthermore, under Ohio R. Evid. 601(B)(1), where the crime charged was committed by one spouse against the other, the victim-spouse is competent to testify against the charged-spouse.[16]

"Federal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001) (citing *Patterson v. New York*, 432 U.S. 197 (1977)). "State court evidentiary rulings do not rise to the level of due process violations unless they 'offend ... some principle of justice so rooted in the traditions of conscience of our people as to be ranked as fundamental.'" *Id.* (omission in original).

Petitioner makes no particular argument in support of his assertion that his due process rights were violated other than to cite to *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) for the proposition that "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." He seems to thereby suggest that allowing the victim of his

---

[16] *Trammel v. United States*, 445 U.S. 40, 52 (1980) governs the spousal privilege under federal law. There, the Supreme Court held that, when it comes to the common law privilege relating to adverse spousal testimony, "the witness-spouse alone has a privilege to refuse to testify adversely." There is also a second marital privilege, namely, the protection given to confidential marital communications. "[A]lthough the privilege against adverse spousal testimony vests in the witness, the defendant retains the privilege to foreclose testimony regarding confidential marital communications[.]" *United Stated v. Sims*, 755 F.2d 1239, 1241 (6th Cir. 1985). That second form of the privilege is not implicated here.

crime to testify against him was "unduly prejudicial." Clearly, if that were so, every criminal prosecution wherein a victim testified would violate the fourteenth amendment. This argument has no merit.

Ground three is overruled in its entirety.

## C.    Ground Four

In ground four, petitioner asserts that he was denied his sixth amendment right of compulsory process (1) when the trial court refused to enforce a properly served subpoena for a defense witness, and (2) when the trial court refused to allow him to present a defense by not allowing his divorce decree into evidence.

The Ohio court of appeals ruled as follows as to subclaim 1:

[*P63] Defendant's fifth assignment of error states:

[*P64] "Defendant was denied his right of compulsory process when the court refused to enforce a subpoena for Regina Campbell."

[*P65] R.C. 2317.21 provides in relevant part:

[*P66] "When a witness, * * * fails to obey a subpoena personally served, the court or officer, before whom his attendance is required, may issue to the sheriff or a constable of the county, a writ of attachment, commanding him to arrest and bring the person named in the writ before such court or officer at the time and place the writ fixes, to give his testimony and answer for the contempt. * * *"

[*P67] In *State v. Wilcox* (June 11, 1992), Cuyahoga App. Nos. 60851 & 60886, 1992 Ohio App. LEXIS 3043, this court stated:

[*P68] "In order to obtain the issuance of a writ of attachment from the court in order to secure the attendance of an absent witness, it is necessary for the disobeying witness to have been personally served with a prior subpoena. R.C. 2317.21."

[*P69] In this matter, defense counsel admitted that Campbell was never served with a subpoena. Accordingly the trial court did not err in refusing to issue a warrant for her.

(Return, Ex. 1.)

Petitioner challenges the state court's finding that Campbell was never served with a subpoena.[17] This Court must presume the correctness of the state court's finding absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Petitioner points to the transcript of the second trial as proof that Campbell was served, but refused to attend the trial, and that the trial court violated his constitutional right to compulsory process by refusing to allow him to have Campbell's affidavit read into the record, by issuing a bench warrant, or by continuing the trial so personal service could be accomplished.

The transcript shows that, on April 4, 2005, out of the presence of the jury, the trial court stated:

Counselors as I instructed you off the record, I'll tell you again, my bailiff did do a search of the docket. It does not indicate that there was a return of service on Rachel Campbell, so at this point I'm not able to issue any warrant for her arrest.

I can reconsider it at a later time if there's been proof of service of a subpoena and her failure to appear based upon that.

(Doc. No. 6-12, Second Trial Tr. at 647.) Then, on April 12, 2005, defense counsel tried to convince the trial court that a subpoena had been issued but, when the sheriff tried to serve it, Campbell refused to accept it. (*Id.* at 771.) The court emphasized to counsel that the week prior she had made clear that either there needed to be a return of the subpoena or evidence of service and the witness's failure or refusal to appear. (*Id.* at 770-71.) Counsel insisted that the sheriff

---

[17] Respondent maintains that this subclaim is procedurally defaulted because O.R.C. § 2317.21 requires personal service of the subpoena on Campbell and because petitioner has failed to establish cause or prejudice for the default. Further, respondent argues, correctly, that application of Ohio's statutes regarding service of subpoenas is not a matter for federal habeas review. (Return at 33.)

would affirm that service had been refused and that counsel himself had gone to her home over the weekend and learned directly from her that she was aware of the subpoena but did not want to testify. She indicated that she had signed an affidavit relating to her knowledge of the facts. (*Id*. at 771-72.) When asked by the trial judge what counsel wanted her to do, counsel indicated that he wanted to use Campbell's affidavit. However, the prosecuting attorney objected, arguing that it could not be cross-examined and that he had no knowledge of the affiant or of whether she actually wrote the affidavit herself or merely signed something that someone had prepared for her. (*Id*. at 772.)[18] The trial court decided that the affidavit could not be used, but that counsel could seek a continuance to bring in the sheriff to testify as to what happened and whether Campbell had been served but refused the subpoena. The trial court stated:

> [...] I've given you every opportunity just to prove to me -- to follow the rules so that I could issue a bench warrant.
>
> I have never had a problem issuing it, I've just been very clear that we have to follow the rules. You have to follow the rules to present the evidence to give me grounds to issue such an extreme thing as having somebody arrested to be a witness to testify. That obligation has been yours throughout.
>
> You orally telling me that or your son orally saying that on the record is not evidence. You know, the evidence is either the docket that reflects the refusal or the actual -- I mean, I've had where the prosecutors have brought in deputies and clerks, people to show me the outside cover of them, of the subpoena.

---

[18] The trial court allowed counsel to proffer the affidavit by reading it into the record as follows:

> [...] My name is Regina Campbell. I could hear Mr. Hardy's granddaughter and daughter's little voices when I was in my kitchen. A little later came yelling in the hall. It was Mrs. Hardy again. She was crying and said, I'll fix you, you rejected me, and I'm going to do you worse than I did you in July.
>
> I was peeking out my kitchen back door window and I turned off the kitchen light. Mr. Hardy said, What do you mean? And she said -- she went outside. Mr. Hardy followed and I could hear a car start and rubber peeling.
>
> Mr. Hardy went back inside and closed the door.

(Doc. No. 6-13, Second Trial Tr. at 772-73.)

So that's what's beyond me, Mr. Mancino. I've told you what I've expected, and that's been compliance with the rules. So if you can still muster that up, I'll certainly delay our trial to execute the search warrant -- not the search warrant, the capias, the bench warrant, and try to expedite things as best we can; but in order to do that, we need addresses, we need physical descriptions, there's much information so that a deputy can go and have her arrested is what we need, but you haven't met the first rule.

The first rule is to show by evidence what you were claiming orally, that she was attempted to be served and refused it. So you want to get that deputy down here with that document. You have had all the opportunity to do it since last week.

MR. PAUL MANCINO: Well, we didn't need her last week.

THE COURT: But you raised the issue last week, and I told you then that the rules need to be followed because, again, it's an extreme remedy that a Court does, and that's issuing a bench warrant for a person not charged with a crime to appear to testify.

\* \* \*

[...] As I said, I have to follow the rules. If you put on evidence, and I've given you the opportunity since the start of the trial, because you've had the issue since the start of the trial and it's redundant. Let's move on.

(*Id.* at 774-75, 777.) Petitioner never brought the sheriff in to testify along the lines that the rules and the trial court required. Therefore, Campbell never testified, her affidavit was not admitted into evidence, and no bench warrant was issued to bring her in to testify.

Petitioner cites *State v. Castle*, 92 Ohio App.3d 732 (Ohio App. 9, 1994), as support for his argument that it was error not to compel the appearance of Campbell because there was sufficient proof that she had been served, contrary to the finding of the court of appeals. However, in *Castle*, the issue was whether valid service could be accomplished by ordinary mail. Steven Shonk and Eileen Ross, who had failed to obey subpoenas, appealed the trial court's contempt findings. The court of appeals in *Castle* ruled that valid service of the summonses had been completed because they had been sent to the "usual place of residence" and

32

because "the record amply indicates that the appellants had actual knowledge of the subpoenas and of the consequences that could result from the failure to obey the subpoenas." *Id.* at 734. In *Castle*, the trial court had conducted a contempt hearing and

> [...] the deputy clerk testified that a week or two before Castle's trial, she ran into Shonk at a local restaurant. Shonk told her that he and Ross and been subpoenaed to appear as witnesses but that they would be out of town on a vacation on April 5. The deputy clerk informed Shonk that he needed to talk to the prosecuting attorney. The prosecuting attorney, Jocelyn Stefancin, testified that Shonk called her on April 1 and told her that he would be on vacation and could not appear at Castle's trial. Stefancin asked Shonk why he had waited so long to inform her of his unavailability. Shonk did not give a reason for the delay but simply restated that he was not going to appear. Stefancin informed Shonk about the consequences of failing to appear, including being cited for contempt. Shonk did not ask for a continuance but again stated that he was not going to appear.
>
> Later that same day, Ross called Stefancin and asked for a continuance, explaining that she had won the vacation in a contest and that she and Shonk had just been made aware of the dates of the trip. Stefancin responded that she could seek a continuance if Ross faxed her the information she had received from the company sponsoring the vacation that notified Ross of the trip dates. Stefancin then told Ross to call her office the following afternoon and she would be told if a continuance was requested. The next day Ross faxed the information but never called. The vacation information revealed that Ross was notified of the vacation dates on March 25, that the vacation began on April 6, and that there was a provision for rescheduling the vacation dates.

*Castle*, 92 Ohio App.3d at 733. Clearly, in *Castle*, there was testimony to support a conclusion that the subpoenas had been served and the witnesses had actual knowledge. In the instant case, although petitioner was given the opportunity to prove that service had been attempted but refused by Campbell, he failed to do so, even though it would have certainly been relatively simple to call the sheriff to testify to those facts.[19]

Petitioner also cites *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) in support of his assertion that he has "the right to put before a jury evidence that might influence a

---

[19] For the sake of the record, the Court also notes that case law from Ohio does not control in the federal habeas context.

determination of guilt." However, *Ritchie* is distinguishable on its facts. In *Ritchie*, a 13-year-old daughter accused her father of rape and sexual assault. Pennsylvania's Children and Youth Services ("CYS") investigated. When Ritchie subpoenaed the file of CYS, which allegedly also included information from a previous investigation triggered by a report by an unidentified source that Ritchie's children were being abused, CYS refused to comply, claiming the records were privileged and confidential under Pennsylvania law. Clearly, *Ritchie*, which involved at least in part the government's obligation to turn over evidence in its possession that is both favorable to the accused and material to his guilty or punishment, has no applicability here.[20]

Finally, without any explanation or argument, petitioner cites *Washington v. Texas*, 388 U.S. 14 (1967), where the Court held that a Texas defendant was denied his sixth amendment right to have compulsory process by state statutes that prohibited use of principals, accomplices or accessories in the same crime as witnesses for each other. Clearly, there is no applicability here.

Turning to the second subclaim of ground four, petitioner challenges the state court's refusal to admit the divorce decree of petitioner and his former wife. The court of appeals denied the same claim on direct appeal, reasoning as follows:

[\*P70] Defendant's sixth assignment of error states:

[\*P71] "Defendant was denied his right to present a defense when the court would not allow the divorce decree into evidence."

[\*P72] Relevant evidence is defined as "any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See Evid.R. 401. The admission or exclusion of relevant

---

[20] Petitioner's additional citations to *State v. Denis*, 117 Ohio App.3d 442 (Ohio App. 6, 1997) and *State v. Ott*, 133 Ohio App.3d 532 (Ohio App. 9 1999) are to no avail. Aside from the fact that state case law is not controlling in federal habeas proceedings, although both cases address principles of compulsory process, neither has anything to do with whether subpoenas were properly served.

evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 Ohio B. 375, 510 N.E.2d 343, paragraph two of the syllabus. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 1993 Ohio 122, 614 N.E.2d 748. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id.*

[*P73] We find no abuse of discretion. There was no decree of divorce in place at the time of the acts at issue so the trial court could properly determine that this evidence was not relevant.

(Return, Ex. 1.)

Petitioner asserts that his right to present a defense was violated when he was not allowed to enter his divorce decree into evidence. He claims that he wanted to use it to rebut the victim's assertion that she had come to his home to recover her wedding ring. There is no doubt that petitioner and the victim were still married on April 5, 2002, the date of the offenses. The divorce decree was issued some time later. Therefore, even though the decree allegedly stated that all personal property between the parties had been mutually and satisfactorily divided, that does not prove that, on the day of the offenses, petitioner was not in possession of a ring belonging to the victim.

This evidentiary matter is not cognizable in federal habeas proceedings and, even if it were, this Court would conclude that there was no constitutional error committed by the state court.

Ground four is overruled in its entirety.

**D.      Ground Five**

In ground five, petitioner asserts that he was denied his six and fourteenth amendment rights of confrontation and cross-examination (and, presumably, due process) when (1) the trial court admitted medical records of the alleged victim, and (2) the trial court allowed

35

an investigating detective to relate conversations with other persons and express his opinions concerning the existence of probable cause.

The state court of appeals addressed the first subclaim as follows:

[*P74] Defendant's seventh assignment of error states:

[*P75] "Defendant was denied his right of confrontation and cross-examination when the court admitted medical records of Susan Hardy (Dent)."

[*P76] Testimonial hearsay is admissible against a criminal defendant under the Confrontation Clause only if the declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant.

[*P77] "Testimonial hearsay" includes testimony at preliminary hearings, before grand juries, and at former trials, as well as statements elicited during police interrogations. *Id*. at 51. In addition, the supreme court identified three kinds of statements that might also be regarded as testimonial: (1) "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 51. *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354,158 L.Ed. 2d 177.

[*P78] Statements made to a medical professional for purposes of receiving medical treatment or diagnosis do not constitute testimonial statements. *State v. Stahl*, 111 Ohio St.3d 186, 2006 Ohio 5482, 855 N.E.2d 834. In any event, defendant was permitted to cross-examine Mardell Takacs, the nurse who authenticated Mrs. Hardy's medical records.

[*P79] This assignment of error is without merit.

(Return, Ex. 1.)

Petitioner asserts that the Ohio court of appeals misconstrued the nature of the medical records which were admitted. He claims that they contained more than a statement concerning injuries, but also contained "hearsay information which was otherwise inadmissible

36

and for which petitioner could not cross-examine the author." (Traverse at 18.) He also contends that the medical records were "testimonial in nature" and entitled him to confrontation and cross-examination. However, he gives no examples from the record to support this assertion.

In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court held that admission of a testimonial statement against a defendant, without an opportunity to cross-examine the witness, "is sufficient to make out a violation of the Sixth Amendment." *Id.* at 68. Medical records are not "testimonial" in nature, within the meaning set forth by *Crawford*.[21] However, even assuming for the sake of argument that the medical records of the victim were "testimonial," there is no sixth amendment violation where, as here, the petitioner had full opportunity to cross-examine the victim herself about her injuries and about these records and what they contained. Petitioner also cross-examined the nurse who authenticated the records. Petitioner does not argue otherwise. Furthermore, even if the medical records were deemed to be

---

[21] In *Crawford*, the Court stated:

> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused--in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

> Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition--for example, *ex parte* testimony at a preliminary hearing.

541 U.S. at 51-52.

inadmissible hearsay, their admission was harmless error, not constitutional error, because of this other live testimony. In other words, the medical records were merely cumulative.

There is no merit to this subclaim and it is overruled.

Next, in subclaim two, petitioner argues that his fourteenth amendment rights were violated when the trial court permitted an investigating detective to relate conversations with other persons and to express his opinions concerning the existence of probable cause. He particularly objects to the fact that Detective Adornetto was permitted to testify to the following: that he interviewed the alleged victim in the hospital emergency room on April 5, 2002 (Doc. No. 6-12, Second Trial Tr. at 570-72); that photographs of the victim's vehicle were relevant because, when she was trying to leave petitioner's home, her driver's side window was pulled down (*id*. at 579-81); that, after some investigation conducted at the police station, he felt he had probable cause to arrest petitioner (*id.* at 582) ; and that, if a crime is committed and an officer has probable cause to believe a particular person committed that crime, the officer is permitted to pick that person up and hold the person for 48 hours until a warrant is obtained (*id*. at 582-83). Petitioner argues that Adornetto was, in essence, allowed to testify that petitioner was guilty.

Respondent argues that petitioner mischaracterizes the detective's testimony in that he did not testify that petitioner was guilty, but only testified as to a police officer's authority to investigate reported crimes and their suspects upon a reasonable belief of probable cause, and the ability to hold the suspect initially for 48 hours and for longer if a warrant is obtained. Respondent points out that investigation of a crime is not indicative of guilt.

"Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the

38

Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Estelle v. McGuire,* 502 U.S. 62, 69-70 (1991)). This high degree of deference accorded state evidentiary decisions means that a petitioner will generally not be able to question "rulings regarding the admission or exclusion of evidence [...] in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988).

  In this case, petitioner has indeed improperly characterized the detective's testimony as giving an opinion both as to the existence of probable cause and as to guilt. The transcript reveals no such testimony. The detective was merely stating, as respondent pointed out, his authority to proceed with an investigation, including his authority to take a suspect into custody for questioning. This is not tantamount to an expression of petitioner's guilt. As to the testimony about interviewing the alleged victim in the emergency room, this was simply a fact and petitioner had the opportunity to cross-examine the detective if he thought this fact was particularly damaging to his case. Finally, although allowing the detective to testify regarding the significance of the photographs of the victim's car, based on the victim's having told him that the petitioner had grabbed her window and had broken the window and the mirror, might arguably have been hearsay, this did not rise to the level of fundamental unfairness in view of petitioner's ability to test these facts on cross-examination of both the detective and the victim herself.

  The Court finds no merit in this subclaim and it is overruled.

  Ground five is overruled in its entirety.

**E.**  **Ground Six**

  In ground six, petitioner asserts that he was denied his fourteenth amendment right to due process and a fair trial when evidence of other bad acts was offered by the prosecuting attorney and bolstered by his statement and conduct.

Petitioner once again argues that there was no differentiation between the counts of rape, kidnapping and abduction. This issue has already been addressed in ground one and need not be discussed again.

Petitioner challenges the fact that the prosecuting attorney was allowed to offer evidence of a confrontation between the petitioner and the victim on March 8, 2005 (Doc. No. 6-11, Second Trial Tr. at 370-74, 389-402); that photographs of the victim's car were admitted although petitioner was not charged with any crime relating to the car (*id*. at 401); that he was questioned about a July 2001 domestic violence complaint (Doc. No. 6-13, Second Trial Tr. at 862); that he was cross-examined about how many times he was married and about church affiliation (*id*. at 834); that the prosecuting attorney accused him of being in the "Bill Clinton School of Sex" (*id.* at 850-51); and that he was questioned about a poisoning claim (*id.* at 864-65, 871). Petitioner also challenges the prosecutor's closing argument: his use of the word "victim" (Doc. No. 6-14, Second Trial Tr. at 934); his arguing about her injuries (*id*. at 943); his "testifying" as to the ineffectiveness of antibiotics for a yeast infection (*id*. at 948); his "testifying" as to what would occur during sexual relations (*id*. at 949); his opinion that petitioner was guilty of kidnapping (*id*. at 964); and his personal opinion as to how victim's of violent crime react (*id*. at 992, 1002).

The state court determined that these were isolated instances. However, petitioner's position is that these instances deprived him of a fair trial. Although, severely prejudicial errors may violate due process, *Estelle*, 502 U.S. at 75, petitioner has made no effort to explain how or why this listing of alleged evidentiary errors, taken singly or together, would have prejudiced his defense. It is not sufficient to assert prejudice and violation of due process. Petitioner must show that trial court errors "so infused the trial with unfairness as to deny due

40

process of law." *Id.* (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)). Mere evidentiary errors by a state court do not alone rise to the level of a constitutional violation and it is not the role of a federal habeas court to review state court evidentiary rulings. *Estelle*, 502 U.S. at 67-68 ("we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Ground six is overruled.

## F.      Ground Seven

In ground seven, petitioner asserts that he was denied due process under the sixth and fourteenth amendments (1) when the trial court failed to limit the application of the statutory definition of sexual conduct with reference to the kidnapping charge, and (2) when the jury was informed that testimony given by the petitioner was to be given different consideration than that of other witnesses.

As to the first subclaim, petitioner asserts that the trial court gave an improper jury instruction with respect to the definition of "sexual activity" for purposes of the kidnapping charge. He argues that this is a sixth amendment violation because, in order to return a guilty verdict, the jury must find that all the elements of the charged offense have been proven beyond a reasonable doubt.

The trial court instructed the jury as follows:

Count 2, kidnapping. The Defendant, Christopher Hardy, is charged in Count 2 of the indictment with kidnapping, in violation of Revised Code Section 2905.01. Before you can find the Defendant guilty of kidnapping, you must find beyond a reasonable doubt that on or about the 5th day of April, 2002, and in Cuyahoga County, Ohio, the Defendant, by force, threat, or deception removed Susan Hardy from the place where she was found or restrained her of her liberty for the purpose of terrorizing and/or engaging in sexual activity with Susan Hardy against her will.

41

* * *

Sexual activity means sexual conduct or sexual contact, or both.

Sexual conduct was previously defined for you in Count 1, the same definition applies herein

Sexual contact. Sexual contact means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttocks, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

(Doc. No. 6-15, Second Trial Tr. at 1010, 1011, 1012.) The definition of "sexual conduct" that was given for Count 1 was:

Sexual conduct. Sexual conduct means, and without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal cavity of another.

(Return, Ex. 1 at ¶ 60.)[22] Petitioner asserts that, under O.R.C. § 2907.05, sexual contact between spouses is not prohibited conduct. In other words, he argues, that he was not "without privilege." However, § 2907.05 deals with the crime of gross sexual imposition. Petitioner was charged with rape and kidnapping. Section 2907.05 does not apply and, as found by the court of appeals, there is no spousal privilege because of the force alleged and because he and the victim were living apart (§ 2907.02(A)(2)) and there is no spousal exclusion for kidnapping. (*Id.* at ¶ 61.)

The jury charge was correct and cannot form the basis of a constitutional claim in the context of habeas proceedings. Therefore, subclaim one is overruled.

In his second subclaim to ground seven, petitioner asserts that the jury instruction regarding the weight to be given his testimony violated the fourteenth amendment. The trial court instructed the jury as follows:

---

[22] The Court has quoted from the opinion of the court of appeals because the copy of the instruction in the record had some of the text obliterated in the copying.

42

The testimony of a Defendant is to be weighed by the same rules that apply to other witnesses who appeared in the case. Just because he is the Defendant is no reason for you to disregard and set aside his testimony, and you will give his testimony the weight which it is entitled to receive, taking into consideration his interest in the outcome of the case, and apply to his testimony the same rules that you will apply to the testimony of all other witnesses who appeared in this case. It is for you to determine what weight you will give to the testimony of any witness who appeared in this case.

(Doc. No. 6-15, Second Trial Tr. at 1018-19.)

Petitioner argues that the phrase "taking into consideration his interest in the outcome of the case" improperly singled out his testimony for special or different consideration from that of other witnesses. The state court of appeals concluded that, since the jury was instructed that "[t]he testimony of a Defendant is to be weighed by the same rules that apply to other witnesses[,]" there was no error with respect to the instruction.

Petitioner points to *State v. Group*, 98 Ohio St.3d 248, 266 (2002), where the court affirmed a trial court's decision not to give a requested instruction concerning police credibility, holding that giving the instruction would run afoul of the principle that "a trial judge may not single out a particular witness or group of witnesses to discuss their credibility, since such a discussion exerts an undue influence on the jury."

The question before this Court is not whether the challenged instruction is "allegedly incorrect under state law." *Estelle*, 502 U.S. at 71-72. Rather it is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id*. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)) (additional citations omitted). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id*. (quoting *Cupp*, 414 U.S. at 147 ). A court must also bear in mind the admonition that "the category of

43

infractions that violate 'fundamental fairness' [is defined] very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

In this case, the trial court also gave the following general instruction regarding the credibility of witnesses:

> You, the jury, are the sole judges of the facts, of the credibility of the witnesses, and of the weight to be given to the testimony of each witness. To weigh the evidence, consider the credibility or believability of each person testifying, and you will apply the test for truthfulness which you apply in your daily lives. These tests include the interest or bias the witness has in the outcome of the verdict; the witness' appearance, manner, and demeanor while testifying before you; the witness' candor and frankness, or lack of candor or frankness; the consistency of the witness' testimony with other known facts in the case; the witness' accuracy of memory, or inaccuracy of memory; the witness' intelligence, or lack of intelligence; the reasonableness or unreasonableness of the witness' testimony; the opportunity the witness had to see or hear or know the truth of the facts and circumstances concerning the things to which the witness has testified; and any or all other facts and circumstances surrounding the testimony which, in your judgment, would add or detract from the credibility and weight of the witness' testimony. Applying these tests, assign to the testimony of each witness the weight which you determine to be proper.

(Doc. No. 6-15, Second Trial Tr. at 1016-17.)

Even if the trial court should not have singled out the defendant's testimony for special mention of the jury's duty to weigh a witness's interest in the case, this Court cannot conclude, in light of the entire set of jury instructions, that this single instruction "so infected the entire trial that the resulting conviction violates due process." Therefore, subclaim two is overruled.

Ground Seven is overruled in its entirety.

44

**G.      Ground Eight**

In ground eight, petitioner asserts that he was denied his fourteenth amendment right to due process when his motion for judgment of acquittal was overruled despite insufficient evidence to permit a rational factfinder to return a verdict of guilty on the charge of kidnapping.

The Ohio court of appeals addressed this issue as follows:

[*P92] Defendant's twelfth assignment of error states:

[*P93] "Defendant was denied due process of law when the court overruled defendant's motion for judgment of acquittal."

[*P94] "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus. See, also, *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 23, 514 N.E.2d 394. *Bridgeman* must be interpreted in light of the sufficiency test outlined in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, in which the Ohio Supreme Court held:

[*P95] "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.)

[*P96] In this matter, defendant was charged with kidnapping. The evidence established that he found or restrained the liberty of the other person, for the purposes of engaging in sexual activity, as he held her down and would not let her leave the bed, by inserting three fingers into her vagina which caught on to her pubic bone. Viewed in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of kidnapping proven beyond a reasonable doubt, so the trial court did not err in denying defendant's motion for judgment of acquittal.

[*P97] This assignment of error is without merit.

45

(Return, Ex. 1.) The Ohio Supreme Court in *Jenks*, quoted by the appellate court, applied the very same test for sufficiency of evidence as that applied by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See also Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("The *Jackson* standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction").

The Sixth Circuit has recently explained the necessary analysis for purpose of a habeas petition as follows:

> To determine whether the state court unreasonably applied the sufficiency-of-the-evidence standard of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), "[f]irst, we must ask whether the evidence itself was sufficient to convict .... [and][t]he inquiry ends if the panel determines that there was sufficient evidence." *Stewart v. Wolfenbarger,* 595 F.3d 647, 653 (6th Cir.2010) (citation omitted). Second, "[i]f we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was 'objectively unreasonable' in concluding that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt." *Id.* (citation omitted). The result of this double deference is that "habeas corpus relief is appropriate based on insufficient evidence only where we find, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Renico,* 506 F.3d 444, 448 (6th Cir.2007).

*Kiriazis v. Polito*, No. 08-3073, 2011 WL 504191, at * 3 (6th Cir. Feb. 15, 2011).

Although the state court's summary of the evidence supporting the guilty verdict on the charge of kidnapping is somewhat sparse, the record is actually much stronger.

First, sufficiency of the evidence must be judged in light of the elements to be proven. For kidnapping, the prosecution must prove that a defendant restrained the liberty of a person and, in this case, did so for the purpose of engaging in sexual activity (which includes both sexual conduct and sexual contact) against the victim's will or for the purpose of terrorizing the victim. O.R.C. § 2905.01. Petitioner claims that the victim's testimony that he inserted

fingers into her vagina, hooked onto her pubic bone, and dragged her across the bed cannot be

believed because there was no evidence of injury to her back or pubic region. However, physical

injury is not an element of the crime of kidnapping.

                Second,  there  was  more  than  sufficient  evidence  which,  if  believed,  would

support the conviction. The victim's actual testimony was as follows:

Q.      [...] Now after you're conversing about Doreen, what happens next in the apartment between you and Defendant?

A.      I'm not sure in exact order, but he started getting angrier. And when he did, I said that I wanted to leave. And when I headed towards the bathroom or whatever, he would pull me back into the bedroom and push me around and then he threw me on the bed.

Q.      How did he pull you back in the bedroom physically?

A.      By my arm and then by my -- a shove.

Q.      Do you recall which arm?

A.      I would assume my left, but both of them.
                MR. PAUL MANCINO: Objection.
                COURT: Overruled.

Q.      You can continue.

A.      But both of them were bruised so --

Q.      Okay. Well, when he would pull you back into the bedroom, did he say anything at that point in time to you?

A.      Yes, he was cussing at me and calling me names.

Q.      If you can, what specifically do you remember him telling you as he pulled you back into the bedroom?

A.      Well, that's when he ripped the shirt off --

Q.      Okay. What happened --

A.      -- when he threw me on the bed.

Q.      What happened when he threw you on the bed? I understand this is
        difficult, but, please, I want you to be specific. What happened when he
        threw you on the bed?

A.      He was cussing at me and --

Q.      Do you remember what he was saying to you by way of cussing?

A.      That I was a fat bitch and that no one would want me. And then when he
        threw me on the bed, he took his right hand with the first three fingers, and
        I was more towards the wall, and he went into my vagina and it like
        hooked onto my pelvic bone and he pulled me across the bed. He did that
        several times, three or four times.

Q.      How did it feel when he did that to you?

A.      It was a lot of pain.

Q.      Did you give him consent or permission to do that?

A.      No, I was wanting to leave, and I was trying to get out of there. And I
        went to attempt to leave and I would make it to -- the bedroom door is
        here, and I would make it to the bathroom. He would get me and throw me
        back in there (indicating).

Q.      Did he ever grab you or pull you in by anything other than your arms that
        you can best remember?

A.      When he ripped the T-shirt off and then he put me back on the bed to
        make me sit there so he could degrade me. You want all that?

Q.      Yes. Please, I apologize, Ms. Dent, but this is a Court of Law and you're
        under oath, so please be as specific as possible.

A.      He said I had moose tits and that my stomach hung down to my pussy.

Q.      Was that before or after he had inserted his three fingers into your vagina?

A.      That was after.

Q.      If you can, take a moment and think about this, Ms. Dent. For how long of
        a time period did this sequence of events last from the point when you
        decided to leave after the conversation about your coworker to the point

48

where he's telling you these things, in minutes, how long did that take place?

A.      I think around an hour or so because he would get -- it just like went fast in my mind that the only thing I was thinking was to try to get out. I tried to leave the bedroom several times.

Q.      How many times -- when you say "several," as best you can remember, how many?

A.      I would say four or five times trying to just get out, and I kept telling him, just let me go.

Q.      If you can then, ultimately how is it that you left the bedroom area?

A.      Well, then he had me on the bed and he would -- he twisted my breasts and he pulled me by that, too, if that's what you meant by pulling.

Q.      I understand.

A.      Okay.

Q.      When did that take place in the sequence of events as best as you can remember?

A.      With the breasts?

Q.      Yes.

A.      That was all right after when he was pulling me with his fingers and he kept getting angrier because I tried to get up and leave.

Q.      When you left the bedroom, where did you go to?

A.      I just made it to the kitchen, the bathroom -- in front of the bathroom, and then he had calmed down at one point and my stomach was hurting, so I got a glass of milk and went into the bathroom to -- I had set it down and I went into the bathroom and then he brought that milk in and just threw it on me.

Q.      He threw the glass of milk on you?

A.      Yes.

Q.      Did he say anything when he did that to you?

49

A.      He was still saying how no one would want me, an old fat bitch like me.

Q.      And I want to move, if I could, to how you were able get out or exit the home. Do you understand my question?

A.      Okay.

Q.      Can you describe that sequence of events for us?

A.      Yes. It must have calmed down for a little bit and well, he had gotten angry. We went back into the bedroom and he said to get out. Bitch, get out. So I'm trying to get my pants to get out. I thought he was going to let me go. He was holding my bra and underwear and he was telling me to get out, but then he wouldn't let me get out.

Q.      How long did that interchange take place, approximately, in minutes?

A.      10, 15 minutes, I don't know.

Q.      Ultimately how is it that you got dressed and were able to exit the home?

A.      I got clothes on and I don't know if he was in the bathroom. I think I was in the bedroom. I grabbed my purse, it was on the kitchen table, and went by real quick, he didn't see me. [...]

(Doc. No. 6-11, Second Trial Tr. at 395-400.)

Because this Court concludes that there was sufficient evidence to convict, under *Kiriazis*, *supra*, the analysis is over. Further, even if this Court were to conclude that the evidence was insufficient, it would still not find that the state court's adjudication of this issue was an objectively unreasonable application of *Jackson*.

Ground eight is overruled.

## V.  CONCLUSION

That Court **REJECTS** the R&R's ultimate conclusion with respect to ground one that petitioner has met his burden of establishing that he was put in jeopardy twice for the same crime. Further, the Court overrules all of the remaining grounds for relief.

Accordingly, the petition for writ of habeas corpus is **DISMISSED**. The Court **CERTIFIES** that an appeal from this decision could be taken in good faith only as to the double jeopardy claim in ground one. 28 U.S.C. §§ 1915(a)(3); 2253(c); Fed. R. App. P. 22(b).

        **IT IS SO ORDERED**.

Dated: March 30, 2011                      _____
                                    **HONORABLE SARA LIOI**
                                    **UNITED STATES DISTRICT JUDGE**